# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LARRY OUTLAW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:11-cv-781-SEB-DML |
| ) | |
| CORRECTIONAL MEDICAL ) | |
| SERVICES, INC., et al., ) | |
| ) | |
| Defendants. ) | |

### Entry Discussing Medical Defendants'
### Motion for Summary Judgment

Plaintiff Larry Outlaw ("Outlaw") was incarcerated at the New Castle Correction Facility ("NCCF") at all times relevant to this complaint. Outlaw is currently confined at the Westville Control Unit. Outlaw has named nine prison medical employees as defendants: LPN Michelle Bertram, Nurse Practitioner Anita Kerrigan, Kelley Kurtz, Dr. Mark Charpentier, Bradley Owens, LPN Doug O'Brien, LPN Robbin Blattner, and LPN Jessica Kenekham, and Correctional Medical Services, Inc. ("Medical Defendants"). In addition, Outlaw named a number of other correctional officer defendants. Outlaw alleges that the Medical Defendants were deliberately indifferent to his serious medical needs when they failed to administer first aid and CPR to him from May 6, 2009, through May 15, 2009. The Medical Defendants seek resolution of Outlaw's claims through the entry of summary judgment.

For the reasons explained in this Entry, the motion for summary judgment filed by the Medical Defendants [26] is **granted.**

### I. Summary Judgment Standard

A motion for summary judgment must be granted Aif the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the *Federal Rules of Civil Procedure*. A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson,* 477 U.S. at 248). The court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

## II. Discussion

### A. Allegations

Outlaw alleges that he "fell unconscious from a diabetic reaction" on May 6, 2009, after his oral medication was removed from his cell. As to the individual defendants, Outlaw alleges that NP Kerrigan, LPN Michelle Bertram, LPN Doug O'Brien, and LPN Jessica Kenekham failed to render proper first aid, CPR and take his vital signs from May 6, 2009, to May 15, 2009. He alleges that LPN Blattner refused to take his vital signs on May 6, 2009, after she found his glucose levels to be "out of control" and after Outlaw told her he was experiencing diabetic complications. Outlaw further alleges that Kelly Kurtz, Dr. Charpentier, and Brad Owens failed to administer proper first aid and CPR from May 6, 2009, to May 15, 2009, failed to take his vital signs, respond to his requests for healthcare, or schedule him for sick call.

### B. Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record that comply with the requirements of Rule 56(c), the following facts, construed in the manner most favorable to Outlaw as the non-movant, are undisputed for purposes of the motion for summary judgment:

While incarcerated at the NCCF, Outlaw was enrolled in the Chronic Care Clinic for diabetes. Diabetes is a serious medical need. As a Chronic Care offender, Outlaw was seen every 12 weeks for his condition and his diabetes was managed with routine blood sugar checks, a quarterly lab test called a hemoglobin A1c, a diabetic diet, exercise, oral medication, and insulin.

Outlaw is a Type II diabetic who is insulin-dependent and takes oral medication. While at the NCCF, Outlaw sometimes refused his medication, insulin and blood sugar checks. Outlaw was also non-compliant with his diabetic diet and ordered food from the commissary that was high in sugar.

Outlaw entered the NCCF on March 13, 2009. Two days later, on March 15, 2009, Dr. Mark Charpentier adjusted Outlaw's medication to minimize hypoglycemia while Outlaw was assigned to live on the mental health range.

NP Kerrigan examined Outlaw in the Chronic Care Clinic on April 14, 2009. She adjusted his medication and ordered a hemoglobin A1C test to check the status of his diabetes. NP Kerrigan also cautioned Outlaw to avoid purchasing food from the commissary. Outlaw refused his evening insulin on April 27, 2009.

Diabetic shock occurs when the blood sugar is too low or from not enough insulin or food. Outlaw was non-compliant with his diabetic treatment which resulted in high blood sugars rather than low. Outlaw had his blood sugar checked and received his insulin and medications from May 6, 2009 to May 15, 2009. Specifically, Outlaw received his Glucophage twice a day from May 7, 2009, to May 9, 2009, twice a day from May 11, 2009, to May 12, 2009, once a day on May 13, 2009, and twice a day on May 14, 2009, to May 16, 2009. Outlaw received insulin every day from May 6, 2009, to May 9, 2009, May 11, 2009, and May 13, 2009, to May 16, 2009. When LPN Bertram gave Outlaw his insulin and medication during the period of May 6, 2009, through May 15, 2009, he was never in any medical distress. In the opinions of Dr. Charpentier, NP Kerrigan, and LPN Bertram, Outlaw did not require CPR, first aid, or his vital signs to be taken during this period of time because he was not experiencing any complication from diabetes or other illness.

On May 12, 2009, Outlaw refused his insulin and blood sugar check. That day, he submitted a Request for Healthcare stating that he did not like the times he had to take his medications and wanted those times changed. In response, NP Kerrigan informed Outlaw that his Glucophage was ordered to be taken at meal time and that he should take his insulin as scheduled. Outlaw met with Dr. Christine Sawyer, a psychologist, on May 14, 2009, and did not express any medical concerns. On May 23, 2009, Outlaw expressed concern that his blood sugars were running high. A nurse noted that his sugars were running in the 200s and that Outlaw had been eating things he should not be from commissary. NP Kerrigan examined Outlaw on May 26, 2009. NP Kerrigan reviewed Outlaw's recent blood sugars, which were not well-controlled. She adjusted Outlaw's medication and noted that he should be on a diabetic diet with evening snack.

On June 8, 2009, LPN Blattner noted that Outlaw was refusing all of his medications, including his insulin, and that he had refused the last two meals. His blood sugar was 234. Outlaw would not explain the reasons for his actions and Nurse Blattner notified the nurse practitioner. On June 21, 2009, after Outlaw submitted a Request for Healthcare that his blood sugars were not well-controlled, NP Kerrigan responded that adjustments had been made to his medications to improve his blood sugars. On August 5, 2009, NP Kerrigan examined Outlaw in

Chronic Care Clinic and took his vital signs. NP Kerrigan increased his insulin because his hemoglobin A1C was elevated. She ordered another hemoglobin A1C test and an 1800 calorie diet with snacks. On August 19, 2009, she reviewed a list of Outlaw's commissary purchases and noted that his diet was uncontrolled. On August 29, 2009, Outlaw refused his insulin and blood sugar check and stated that he was no longer diabetic.

Kelley Kurtz was the Health Services Administrator ("HSA") at the NCCF in May, 2009. Her job was to order medical supplies for the facility, hire medical staff, maintain the nursing staff schedule, respond to offender grievances regarding medical issues, and deal with human resources issues for the medical staff. Kurtz never treated or provided any medical care to any offender at the NCCF. Kurtz did not make any treatment decisions regarding offenders and had no involvement in determining whether an offender needed a particular medical procedure or medication. Kurtz's role as HSA was administrative and she did not provide input or guidance regarding any offender's course of medical treatment. She did not review offenders' requests for healthcare, nor did she schedule offenders to see the nurses or doctors. That job was done by a member of the nursing staff. Kurtz had no authority over and did not exercise any control over the physician or nursing staff with regard to their medical care and treatment of Outlaw. The decisions regarding Outlaw's course of treatment were made by the doctors and nurses, not by Kurtz.

### C. Analysis

At the time of his confinement at the NCCF, Outlaw was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment=s proscription against the imposition of cruel and unusual punishments. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a medical claim that a prison official has violated the Eighth Amendment, a plaintiff must demonstrate two elements: (1) an objectively serious medical condition; and (2) deliberate indifference by the prison officials to that condition. *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006).

A[A]n objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.@ *Id.* at 584-85 (internal

quotation omitted). The defendants do not dispute that Outlaw had an objectively serious medical condition which needed to be monitored and treated, diabetes.

As to the second element, "[t]o show deliberate indifference, the plaintiff must demonstrate that the defendant was actually aware of a serious medical need but then was deliberately indifferent to it." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood,* 512 F.3d 886, 895 (7th Cir. 2008) (internal quotation omitted); *see also Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). "Deliberate indifference is more than negligence and approaches intentional wrongdoing." *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (internal quotation omitted). "[D]eliberate indifference is essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* (internal quotation omitted). "Even gross negligence is below the standard needed to impose constitutional liability." *Id.* (internal quotation omitted).

### *Defendant Correctional Medical Services, Inc.*

Correctional Medical Services, Inc. ("CMS") is the company that contracts with the Department of Correction to provide medical services to state prisoners. For CMS to be liable for deliberate indifference, Outlaw must present evidence that a denial of medical treatment or other constitutional deprivation was undertaken pursuant to an express policy, custom or wide-spread practice. *See Grieveson v. Anderson,* 538 F.3d 763, 773 (7th Cir. 2008); *Calhoun v. Ramsey,* 408 F.3d 375, 379 (7th Cir. 2005). Outlaw has not alleged nor shown that CMS maintained a policy or custom that violated his constitutional rights. Therefore, CMS is entitled to summary judgment.

### *Defendant HAS Kelley Kurtz*

Without personal liability, there can be no recovery under 42 U.S.C. ' 1983. *Burks v. Raemisch,* 555 F.3d 592, 593-96 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise . . . . *Monell's* rule [is] that public employees are responsible for their own misdeeds but not for anyone else's.")(citing *Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978)).

It is undisputed that HSA Kurtz held an administrative job, not one of providing medical care. She had no control over the medical personnel. She did not review requests for healthcare, nor did she schedule offenders to see the medical

staff. Under these circumstances, Kurtz cannot be liable for any failure to provide medical treatment. Therefore, Kurtz is entitled to summary judgment.

*Defendants LPN Michelle Bertram, NP Anita Kerrigan, Dr. Mark Charpentier, Bradley Owens, LPN Doug O'Brien, LPN Robbin Blattner, and LPN Jessica Kenekham*

Outlaw alleges that on May 6, 2009, at around 1:15 pm, he was woken up by a correctional officer yelling into his cell. Outlaw alleges that he felt dizzy and sweaty. He contends that he had fallen unconscious as a result of missing a dose of his oral medication. He alleges that correctional officers refused to notify medical staff. He acknowledges that LPN Blattner was in his cell within three hours to perform a glucose reading but determined that no treatment was required at that time.

Outlaw contends that LPN defendants Bertram, O'Brien and Kenekham, failed to administer CPR and take his vital signs during the period of May 6, 2009, through May 15, 2009. There is no evidence that supports Outlaw's contention that he required CPR during this period of time, or that checking his vital signs was medically necessary. Rather, the medical professional defendants have opined that Outlaw never required CPR. The medical records reflect that during the period of time at issue, Outlaw was seen by medical staff approximately every two weeks because he was diabetic and being monitored by the Chronic Care Clinic. Specifically, he was seen at the clinic on April 14, 2009 (chronic care visit), April 27, 2009 (chart update, refused pm insulin), May 12, 2009 (chart update, refused insulin and accu check), and May 14, 2009 (monthly segregation visit by psychologist).

In addition to being seen in the clinic, the record shows that Outlaw received his oral medication and insulin every day from May 7, through May 15, 2009, except on May 10, 2009, and on May 12, 2009 (when he refused his insulin). It is Dr. Charpentier's opinion that because of Outlaw's non-compliant history (before and after May of 2009) of refusing insulin and blood sugar checks and eating high sugar foods, Outlaw's diabetes was typically not well-controlled and his medication had minimal effect. In the opinion of Dr. Charpentier, the medical care rendered to Outlaw at the NCCF was reasonable, appropriate, and within the standard of care. Dr. Charpentier further opined that although Outlaw's diabetes was not well-controlled, his medical condition was stable while at the NCCF and Outlaw never experienced a serious medical need from his diabetes in May 2009.

Outlaw believes he passed out in his cell on May 6, 2009. Assuming for purposes of this motion that that did occur, he has not shown any deliberate indifference by any of the Medical Defendants that either caused him to pass out or failed to provide proper treatment at that time. Even if he did not receive his

prescribed medication on May 6, 2009, no medical evidence supports his allegation that he experienced serious medical distress as a result. As noted, Outlaw acknowledges that a nurse visited him in his cell that afternoon to take his blood sugar levels but she determined that nothing further was needed. Certainly, Outlaw was conscious at the time of the nurse's visit and CPR was not indicated. The Medical Defendants have opined that Outlaw experienced no serious complications from his diabetes, despite his periodic refusals to eat a proper diet, take medicine and insulin, and to have his blood sugar checked. Their opinions are not contradicted by any other medical opinion and are accepted for purposes of this motion.

"We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000). The totality of care approved by the Medical Defendants negates any inference of deliberate indifference. There is no genuine issue of fact that the Medical Defendants were aware of any medically necessary treatment, including CPR or first aid, but refused to provide it.

### III. Conclusion

For the reasons set forth above, the motion for summary judgment filed by the Medical Defendants [26] must be **granted.**

The court's ruling on the Correctional Facility Defendants' motion for summary judgment is also being issued. All claims against all defendants have now been resolved. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 01/15/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All electronically registered counsel

Larry Outlaw
DOC #900496
Westville Control Unit
5501 South 1100 West
Westville, IN 46391